UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA     \*     CRIMINAL NUMBER  13-0118

VERSUS     \*     JUDGE ROBERT G. JAMES

MICHAEL PRYOR     \*     MAG. JUDGE KAREN L. HAYES

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 16] filed by Defendant, Michael Pryor.  For reasons stated below, it is recommended that the motion be **DENIED.**

On December 6, 2012, an unnamed informant led City of Monroe police officers to an address at 2210 Gordon Avenue, Monroe, Louisiana, – the informant's purported source for marijuana that police had found on him.  After obtaining additional evidence that drug transactions were occurring at the residence, the officers proceeded to conduct a "knock and talk."  According to the officers, Michael Pryor answered the door, granted them entry into the home, and consented to the officers' request to search the house. Pursuant to the search, the officers uncovered, *inter alia*, more than 29 grams of high grade marijuana and a revolver.  Pryor also made various incriminating statements to the officer(s) during the encounter.

On April 24, 2013, a federal grand jury returned a three count indictment against Michael Pryor for felon in possession of a firearm and ammunition, to wit: a Heritage Manufacturing, model Rough Rider, .22 caliber revolver and .22 ammunition; possession with intent to distribute marijuana; and possession of a firearm in furtherance of a drug trafficking crime, all in violation

of 18 U.S.C. §§ 922(g)(1) & 924(a) & (c)(1), and 21 U.S.C. §§ 841(a)(1) & (b)(1)(D).  Also, the government seeks forfeiture of the aforementioned firearm, ammunition, and drug paraphernalia comprised of digital scales, baggies, and scissors.

On July 8, 2013, Pryor, via counsel, filed the instant motion to suppress all evidence seized and any statements made by him stemming from the purportedly unlawful search of his house.  Following a delay for an August 16, 2013, evidentiary hearing, and transcription of same, the matter is now before the court.

## I.      HEARING TESTIMONY

The following facts were established via testimony presented at the August 16, 2013, hearing held in this matter.[1]  Four witnesses testified at the hearing:  Monroe Police Officer Chris Fulmer, West Monroe Police Officer Nicholas Oglesby, Davon Chisley, and Jonathan Chisley.

Chris Fulmer is a 13+ year veteran of the Monroe Police Department, with 11 years in the street crimes or narcotics division.  (Tr. 4-5).  He attended the Louisiana Delta Police Academy and is "POST" certified.  *Id*.  At all relevant times, he was assigned to the FBI Safe Streets Task Force.  (Tr. 6).

Nicholas Oglesby is a commissioned West Monroe Police Officer with just under 11 years of service.  (Tr. 104).  He received training at the regional academy, and is a member of Metro Narcotics of Ouachita Parish.  *Id*.

Davon Chisley and Jonathan Chisley are Michael Pryor's stepsons.  (Tr. 58, 82).  Davon Chisley is a former member of a Monroe street gang who is currently serving a portion of a five year sentence on a state charge for possession of marijuana with intent to distribute that arose out of the same circumstances at issue in this case.  (Tr. 56-57).  Jonathan Chisley does not have any

---

[1]  No exhibits were introduced into evidence.

convictions.  (Tr. 92).

On December 6, 2012, Officer Doug Lambert contacted Officer Fulmer and told him that he had recovered marijuana from an individual pursuant to a traffic stop.  (Tr. 6).  Lambert told Fulmer that the individual (informant) wanted to talk to someone about the marijuana, so Lambert forwarded the informant's contact information to Fulmer.  *Id*.  Fulmer and Detective Sadler contacted the informant and arranged to meet him in a parking lot.  *Id*.  The informant told Fulmer and Sadler that he had bought marijuana from a residence on Monroe's south side from a black male who was between 35 and 40 years old and had a slim build.  (Tr. 6-7).

The informant agreed to ride with the officers to show them where he had purchased the marijuana, and ultimately identified a house located at 2210 Gordon Street.  (Tr. 8).  He also singled out the male standing in the carport wearing black clothes as the person who sold him the drugs.  *Id*.  The officers later identified the individual in black as Michael Pryor.  (Tr. 8-9).

Fulmer and Sadler brought the informant back to his car, and then returned to the vicinity of 2210 Gordon Street where they surveilled the house from a nearby business parking lot.  (Tr. 9).  They observed a constant flow of pedestrian and vehicular traffic stopping at the house.  (Tr. 9-10).  The pedestrians would walk up to the house, disappear beneath the carport for a few seconds, and then depart.  (Tr. 10).  Based on his many years of narcotics investigations, Fulmer believed that this activity was consistent with street level narcotics sales.  *Id*.

Because of the activity they observed, Fulmer and Sadler decided to stop one of the cars after it left the residence.  (Tr. 11).  The officers observed a small gray SUV stop at the residence, whereupon a black male dressed in black briefly entered and exited the vehicle.  (Tr. 11).  Fulmer and Sadler followed the SUV, and signaled to a marked police unit to effect a traffic stop.  *Id*.

Pursuant to the traffic stop, the stopping officers uncovered a bag of high grade

3

marijuana.  (Tr. 11-12).  Furthermore, the driver of the vehicle told these officers that he had just bought the marijuana from a residence around Gordon and Forrest streets.  *Id*.[2]  The driver also described the seller as a black male wearing all black clothing.  *Id*.

At that point, Fulmer and the other officers decided to attempt to speak to the persons at 2210 Gordon Avenue.  (Tr. 12, 50).  Officers Fulmer, Sadler, Oglesby, and Asmussen were wearing plains clothes, with ballistic vests that had "POLICE" inscribed in three to four inch letters across the front and back.  (Tr. 12-13, 104-105).  There also were other uniformed officers present.  *See* Tr. 53.

As the officers approached the rear of the house,[3] they observed an individual run through the carport of the residence, around the house, and over a fence.  (Tr. 51).[4]  During his earlier surveillance of the home, Fulmer had seen this individual come and go between the house at 2210 Gordon Avenue and the adjacent house.  (Tr. 51).  In Fulmer's experience, it was common for drug dealers to keep their money and drugs separate to prevent the loss of both to the police.  (Tr. 51).  Consequently, police officers, including Sadler, gave chase to the individual, and apprehended him less than one block away.  (Tr. 51-52).

While Officer Sadler tended to the apprehended individual,[5] Fulmer proceeded to

_____

[2]  2210 Gordon Avenue is on the corner of Gordon and Forrest streets.  (Tr. 12, 38).

[3]  Because 2210 Gordon Avenue is a corner house, the carport faces Forrest Avenue.  (Tr. 38).  Thus, the carport entrance is on the back side of the house.  *Id*.  Officer Fulmer referred to the residence's kitchen door under the carport as the "front door," as that was what most people used.  (Tr. 39).  In addition, Davon Chisley referred to the carport door as the "front door."  (Tr. 64-65).

[4]  Davon Chisley tentatively identified the individual as "Charles," who resided next door.  (Tr. 59, 68).  Jonathan Chisley testified that he knew the individual as "Troublemaker."  (Tr. 95).

[5]  *But see* Tr. 106 (Oglesby testified that he, Sadler, *and* Fulmer, all chased the individual).

4

investigate the residence at 2210 Gordon Avenue.  *See* Tr. 51-52.  In the carport, Fulmer

encountered Davon Chisley and Jonathan Chisley.  (Tr. 13).  Because they appeared to be

teenagers, albeit adult teenagers, he asked them who owned the residence.  (Tr. 14).  They replied

that the house belonged to their mother and father.  (Tr. 14).  Fulmer asked whether their parents

were home; they replied that their "Daddy [was there]."  *Id*.

According to Fulmer, he then stepped up to the door under the carport and knocked.  (Tr.

14-15).[6]  Michael Pryor answered the door.  *Id*.  Fulmer told Pryor that he was looking for "the

Daddy," because Pryor did not look old enough to be the father of the older teenagers in the

carport.  *Id*.  Pryor replied, "I am the Daddy."  (Tr. 15).  Fulmer explained to Pryor that he needed

to talk to him, and asked whether he would mind letting them step into the house to discuss his

business.  (Tr. 15).  Pryor stepped back, motioned them inside, and said "sure."  *Id., see also* Tr.

107-108.

As soon as Fulmer and Oglesby stepped into the kitchen of the house, they detected a

strong odor of green or raw marijuana, which is distinct from burnt or burning marijuana.  (Tr.

16, 19, 108).  Upon smelling the marijuana, Officer Fulmer advised Pryor of his Miranda rights,

which he appeared to comprehend.  (Tr. 17-18).[7]  Fulmer explained to Pryor that he was there to

investigate the sale of marijuana from the house.  *Id*.  Fulmer queried whether there was any

marijuana in the residence; Pryor replied, "no."  *Id*.  Fulmer then asked Pryor whether they could

search his residence, to which he replied, "yes."  *Id*., *see also* Tr. 109-110.

Fulmer testified that it was his practice to reconfirm an individual's initial consent to

---

[6]  Approximately three other officers were next to Fulmer when he knocked on the door:
Oglesby, John Asmussen, and a uniformed officer, Josh Sanson.  (Tr. 43).

[7]  Officer Oglesby, however, did not recall Fulmer advising Pryor of his Miranda rights.
(Tr. 110).  Fulmer did not have Pryor sign a rights card or waiver of rights form.  *See* Tr. 48.

search a house.  (Tr. 18).  So, he asked Pryor again "you don't mind if we search your house?" and again, Pryor replied "no, go ahead."  *Id*.  Fulmer did not have a consent to search form with him that day.  (Tr. 36).  However, he generally kept a form in the pocket of his vest.  *Id*.  Fulmer asked the other officers who came into the house whether they had a form, but no one did.  (Tr. 49).[8]  Fulmer testified that if Pryor had refused to consent to search, then he would have sought a search warrant.  (Tr. 50).

After securing Pryor's consent, Officers Asmussen and Oglesby began to search the home.  (Tr. 18).  During the search, Fulmer stayed in the kitchen with Pryor.  (Tr. 18-19).  After about ten minutes, Asmussen or Olgesby exclaimed to Fulmer to come look at what they had found.  *See* Tr. 19, 22.

By this time, FBI Special Agent Josh Kolarcik had arrived on scene.  *Id*.  Fulmer left Pryor with Kolarcik while he went to see what Asmussen and Oglesby were excited about.  (Tr. 19).  Fulmer found the two officers in a bedroom, where they showed him a jar of high grade marijuana, called "Kush" or "Purp," that they had discovered.  (Tr. 19-21).

Fulmer then returned to Pryor and asked him which room was his.  (Tr. 21).  Pryor pointed to the bedroom that Fulmer had just exited and confirmed that was his room.  *Id*.  Fulmer asked Pryor what they would find in his room.  (Tr. 21).  Pryor replied that they would find some marijuana in a jar, a pistol under the mattress, and a shotgun in the closet.  *Id*.

Fulmer told the other officers about the weapons in the room.  (Tr. 21-23).  The officers ultimately uncovered a .22 caliber Heritage revolver hidden beneath the mattress, but were

---

[8]  Oglesby, however, denied that Fulmer asked him for a consent form.  (Tr. 115-116).

unable to find the shotgun.  *Id.*[9]  At that point, Fulmer handcuffed Pryor and placed him under arrest.  *Id.*  He had not been handcuffed or restrained before that time.  *Id.*  Furthermore, Pryor never withdrew his consent, or otherwise told the officers to stop searching his house.  *Id.*  When asked about the weapons, Pryor explained that he kept them for protection.  (Tr. 24-25).

Fulmer then returned Pryor to the kitchen area, and started looking through the cabinets where he found scales, baggies, and a pair of scissors on one of the shelves.  (Tr. 25).  The scales and box of baggies had marijuana residue on them.  (Tr. 25-26).  Fulmer asked Pryor about the marijuana in the jar; Pryor replied that he usually bought 14 grams of marijuana at a time for his own use.  *See* Tr. 25-26.  Fulmer then asked Pryor about the scales; Pryor explained that he used the scales to weigh his marijuana to make sure that he received what he paid for.  (Tr. 26).  He also said that he used the baggies to pack his child's school lunch.  *Id.*

Fulmer testified at the hearing that Pryor still had not withdrawn his consent to search.  (Tr. 26-27).  In fact, Pryor had remained very polite.  *Id.*

The searching officers also located two bags in the hallway near the master bedroom; one bag contained 13 individual baggies with 1.8 grams of high grade marijuana in each; the other bag contained 10 individual baggies of .6 grams of marijuana.  *Id.*   (Tr. 27).  This packaging was consistent with street level sales of marijuana.  *Id.*  In another room, the officers found a tin container with marijuana residue and three pistols.  (Tr. 28).

Fulmer questioned Pryor about the scales, the baggies, and the two bags broken down into different amounts of marijuana.  (Tr. 29).  Pryor replied "Man, you got me.  What you want me to say?  You found it.  You got me."  *Id.*  Fulmer asked Pryor about the guns and marijuana in the

---

[9]  Pryor later explained that his cousin must have retrieved the shotgun to go hunting or something.  (Tr. 23-24).

back room.  *Id*.  Pryor replied that that room was his son's room; thus, Fulmer would have to talk to him.  (Tr. 29).

Fulmer went outside to talk to Davon Chisley.  (Tr. 29).  He advised Davon of his "rights."  *Id*.  Davon admitted that he smoked marijuana, and that his mother had given him one of the pistols.  (Tr. 30).  He declined to comment on the other two guns.  *Id*.

Fulmer testified that Jonathan Chisley and Davon Chisley were not in the house at the time that Michael Pryor gave him permission to enter and search.  (Tr. 33).  Fulmer further indicated that the Chisleys were some ten feet away from the kitchen door.  (Tr. 33-34).[10]

Davon and Jonathan Chisley recalled the December 6 encounter somewhat differently than the officers.  Davon testified that he was asleep inside the house when he heard a boom at the back door of the house.  (Tr. 57).  This prompted Davon to walk outside with his three year old brother, Michael Pryor, Jr. ("Little Mike").  *Id*.  Michael Pryor, however, remained inside.  (Tr. 58).  Davon watched the police who already had taken another man into custody.  (Tr. 58-59).

Davon testified that the police eventually released the man, then came under the carport and asked him and his brother to step aside.  (Tr. 59-60).  The police proceeded to enter the home and searched it.  *Id*.  Davon did not see them knock; rather, they opened the door and walked right in.  *Id*.

While the police searched the home, Davon decided to walk his three year old brother down the street to place him in his uncle's care.  (Tr. 61).  He then returned to the carport.  *Id*.

---

[10]  Fulmer testified that the distance the Chisleys were from the door was about the same distance as defense counsel was from the witness stand and lectern in the courtroom.  *See* Tr. 33-34.  Without actually having measured the distance between these two points, the court takes judicial notice that they likely are at least ten feet apart, or at minimum, not immediately adjacent.

Davon believed that all of the officers were in the house – otherwise, they would not have let him leave the scene. *Id*. Davon did not see what happened in the house. (Tr. 62). He did not see his father when the police opened the door. (Tr. 62). He also did not hear the police ask for permission to enter the residence. *Id*. After the police finished searching the residence, they came back outside and arrested Davon. (Tr. 62).

Jonathan Chisley testified that he arrived at the residence at around 11 a.m. or 12 p.m., at the latest. (Tr. 84). When he first walked into the yard, Michael Pryor and Little Mike were sitting in the yard. (Tr. 84-85). About three to five minutes later everything happened. *Id*. Jonathan saw a truck pull up next to someone with whom they had just finished speaking. (Tr. 85). He thought the man was getting robbed. *Id*. As soon as Jonathan figured out that it was the police, he told his Dad to take Little Mike inside just in case they decided to search the yard. *Id*. After bringing Little Mike inside, Jonathan and Davon returned outside. (Tr. 85).

The police caught the man that had fled, and then brought him to the front of the house. *Id*. They talked to him for a little bit, and then Jonathan saw the man gesture towards Jonathan and Davon. *Id*. At that point, the police came over. (Tr. 85-86).

Jonathan testified that he and Davon were near the kitchen door as the police approached. (Tr. 86). Michael Pryor was in the house with Little Mike, on the phone with Jonathan's mother. *Id*. The police asked Jonathan and Davon who was in the house, and whether there was anything in there that they needed to know about. (Tr. 86-87). Davon volunteered that he had a firearm in his room. *Id*.

The police then knocked on the door. (Tr. 87). Pryor came to the door, while still talking on the phone. *Id*. The police told him that he needed to hang up the phone. *Id*. As soon as Pryor complied, four or five of the police officers pushed Pryor back into the house, entered the

9

home, and closed the door behind them.  (Tr. 87-88, 98-99).  They did not request permission to

enter the home.  (Tr. 87-88).  The police did not shout, and were not rude at all.  (Tr. 99).

After about five to ten minutes had passed, one of the officers brought Little Mike outside

to Jonathan and Davon.  (Tr. 88).  Jonathan brought Little Mike to his "godbrother," who

"stayed" up the road.  (Tr. 88-89).  The police, however, told Davon that he could not leave.  *Id*.

Jonathan did not see the police search the house because they would not let him inside.  (Tr. 89).

## II.    LAW AND ANALYSIS

Defendant contends that the officers violated his Fourth Amendment rights when they

searched his residence without a search warrant, without consent, without lawful cause, and

without exigent circumstances.  Consequently, he argues that the evidence seized and any

statements made during this unconstitutional search must be suppressed.  The defendant normally

bears the burden of proving by a preponderance of the evidence that the challenged search or

seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)

(citation omitted).   However, when, as here, law enforcement officers act without a warrant, the

government bears the burden of proving that the search was valid.  *Id*.; *see* discussion, *infra*.

### a)    The Officers Did Not Violate the Fourth Amendment By Conducting a "Knock and Talk"

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend.

IV.[11]  Under the Fourth and Fourteenth Amendments a search conducted without a warrant

───────────────

[11] As a preliminary matter, the undersigned observes that Defendant possesses the requisite standing to assert a Fourth Amendment violation.  At minimum, it is uncontested that Pryor resided at 2210 Gordon Avenue.  *See Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990) (a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable").

supported by probable cause is presumptively unreasonable, subject to but a few well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973). Nonetheless, law enforcement officers are not constitutionally obliged to halt a criminal investigation and apply for a search warrant as soon as they obtain requisite evidence to establish probable cause. *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1860-61 (2011).  Instead, officers, without a warrant, are permitted to "approach a home and knock, precisely because that is no more than any private citizen might do." *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1416 (2013) (citation and internal quotation marks omitted).[12]  Of course, as is also true when a private citizen knocks on the door, the occupant is under no obligation to open the door or to speak to the officer. *Kentucky v. King, supra*.  Moreover, "even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Id*.

Based on information that he obtained from two independent sources, as well as his own observations, it is manifest that Officer Fulmer had gathered ample evidence to support a search warrant before approaching the home.  However, rather than expending the time and effort to apply for a warrant, Fulmer opted to knock on the door to see whether he could streamline the process by obtaining the owner/occupant's permission to enter and search the home.  This

---

[12] One of the recognized reasons that officers may choose this so-called "knock and talk" strategy is so they may seek consent to search from the occupant of the home, thereby obviating the time and inconvenience of applying for a warrant.  *Kentucky v. King, supra*; *but see Johnson v. United States*, 333 U.S. 10, 15, 68 S. Ct. 367, 369 (1948) (inconvenience to the officers, and some slight delay to prepare papers and present the evidence to a magistrate, never constitutes a convincing reason to bypass a search warrant).

investigative tactic is not inherently unreasonable.  *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

Although not raised directly by Defendant in his brief, defense counsel's questioning at the hearing implied a potential issue regarding the propriety of initiating the "knock and talk" from the home's rear entrance.  In other words, by approaching the home from the rear, the officers may have breached the curtilage, i.e., an area that is "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *United States v. Cooke*, 674 F.3d 491, 494 (5th Cir.) *cert. denied,* ___ U.S. ___,  133 S. Ct. 756 (2012) (citation omitted).  In determining whether an area outside the home is curtilage, the court must consider four factors:  "the proximity of the area to the home, whether it is within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from outside observation."  *United States v. Thomas*, 120 F.3d 564, 571 (5th Cir. 1997).

Applying the foregoing considerations here, the undersigned finds that the officers' decision to initiate the "knock and talk" at the home's rear entrance did not transgress the Fourth Amendment.  Although the carport and rear entrance, by definition, were near to, or part of the home, there is no evidence that the carport and driveway were enclosed, gated, or that the home's occupant(s) had taken any other steps to protect the area from outside observation.  Furthermore, the officers had observed the carport area being used by multiple persons to approach the home.  Finally, even if the officers had breached the curtilage, any violation was cured by Defendant's subsequent consent to enter and search the home.  *See Cooke, supra* and discussion, *infra*.

### b)      Defendant Freely and Voluntarily Granted Consent to Enter and Search the Home

The government contends that the Fourth Amendment's warrant requirement was

12

obviated by Defendant's consent to enter and search the home.  To meet this exception to the warrant requirement, the government must prove by a preponderance of the evidence (1) that consent was given, (2) voluntarily, (3) by a party with actual or apparent authority, and (4) that the search was within the scope of the consent.  *United States v. Freeman*, 482 F.3d 829 (5th Cir. 2007); *United States v. Santiago*, 410 F.3d 193, 199 (5th Cir. 2005).  The first two inquiries are determined based on the totality of the circumstances; whereas the court weighs the latter two considerations under a reasonable officer standard.  *Id*.

### 1) Pryor Granted Permission to Enter and Search the Home

Consent need not be express, it may be signaled by the consenting party's actions.  *See United States v. Scroggins*, 599 F.3d 433, 442 (5th Cir. 2010).  The court notes that the evidence is in conflict as to whether Pryor actually granted the officers access to the home, or whether the officers simply forced their way into the house.  The court resolves this dispute in favor of Officers Fulmer and Oglesby.  The officers presented as earnest and credible witnesses, albeit Officer Oglesby's recollections were not as detailed as Officer Fulmer's.

Conversely, Davon Chisley was not a credible witness.  His testimony that he brought Little Mike to another residence down the road was contradicted by his brother, Jonathan, and rested upon his implausible claim that no officers remained outside during the search.  Although there is no question that Jonathan was a more credible witness than Davon, his testimony also might have been motivated by the desire to help his stepfather.  Alternatively, he simply may not have overheard the officers when they asked Pryor for permission to enter the home.  The court is permitted to credit the testimony of the officers under these circumstances.  *See United States v. Martinez*, 410 F. App'x 759, 763 (5th Cir. 2011).

The court also finds that, after receiving permission to enter the home, Officer Fulmer

obtained Pryor's consent to search the home.  Both Fulmer and Oglesby's testimony remains uncontroverted in this regard.  Davon and Jonathan Chisley remained outside the home, and thus, could not hear whether the officers sought and obtained consent.  The court acknowledges the conflict between Fulmer and Oglesby regarding whether Fulmer asked Oglesby for a consent to search form.  However, it is likely that Fulmer asked the officers as a group, and/or Oglesby did not recall the request.

Oglesby also did not recall Fulmer advising Pryor of his *Miranda* rights.  However, the court credits Fulmer's testimony that he so advised Pryor of his rights shortly after entering the home and before requesting consent to search.[13]

### 2)    Pryor's Consent was Voluntary

Voluntariness of consent is determined by the totality of the circumstances, comprised of six factors:

(1)    the voluntariness of the defendant's custodial status;

(2)    the presence of coercive police procedures;

(3)    the extent and level of the defendant's cooperation with the police;

(4)    the defendant's awareness of his right to refuse to consent;

(5)    the defendant's education and intelligence; and

(6)    the defendant's belief that no incriminating evidence will be found.

*United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) (citation and internal quotation marks omitted).

Although all six factors are relevant, no single factor is dispositive.  *Id*.

Applying the foregoing considerations to the evidence at hand, the court finds that at the

---

[13]  The court notes that Oglesby also did not recall other more benign details of the encounter.  *See e.g.*, 113-114.

time of the consent(s), Pryor was not in custody.  Rather, he verbally consented to the search in surroundings familiar to him, i.e. in his home, rather than at the police station.  *See United States v. Riley*, 968 F.2d 422, 426-427 (5th Cir. 1992).

Furthermore, the officers did not engage in coercive procedures.  Although approximately four officers, most all of them wearing ballistics vests emblazoned with "POLICE," sought and obtained entry into the home, Jonathan Chisley agreed that they were not rude.  In addition, there is no evidence that any weapons were drawn or that the officers threatened, or otherwise shouted at Pryor while soliciting his consent.

When questioned, Pryor initially lied about the presence of marijuana in the house. Nonetheless, Pryor remained polite and cordial throughout the encounter.  Also, he became more forthcoming once the officers uncovered contraband.

There is no evidence that Pryor was aware of his right to refuse consent.  However, Pryor was not a novice in matters of criminal and police procedure.  *See United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976) (defendant was not a newcomer to the law).[14] Moreover, before seeking consent to search, Officer Fulmer advised Pryor of his *Miranda* rights, which included his right to cease responding to questions at any time that he so chose.  *See* Tr. 17; *Riley, supra* (remarking that the officers had advised defendant of his *Miranda* rights).

No evidence of Pryor's education and intelligence was adduced at the hearing.  However, he appeared to understand his *Miranda* rights.  (Tr. 17-18).  Finally, because of the number of items and caches located in the house, Pryor likely knew that incriminating evidence would be discovered, especially since they apparently were not well hidden.

Upon consideration of the totality of the circumstances, the undersigned finds that Pryor's

---

[14]  Officer Fulmer testified that Pryor had previous felony convictions.  *See* Tr. 24.

consent to enter and search the home was voluntary.  *See e.g., United States v. Estrada*,  459 F.3d 627 (5th Cir. 2006) (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics); *United States v. Timoteo*, 353 Fed. Appx. 968, *6 (5th Cir. Dec. 1, 2009) (unpubl.) (arrestee's verbal consent to a limited search was voluntary, where he was very cooperative and despite his refusal to sign written consent).

### 3)      Pryor had Actual or Apparent Authority to Consent

There is no dispute that Pryor had actual or apparent authority to confer consent to enter and search the address at 2210 Gordon Avenue.  Officer Fulmer testified that Davon and Jonathan Chisley told him that the house was his mother and father's residence.  (Tr. 14-15).  Moreover, Fulmer confirmed that Pryor was their father.  *Id.*  Jonathan Chisley also agreed that Pryor lived there.  *See* Tr. 83.

### 4)      The Search was within the Scope of Pryor's Consent

"When the police are relying upon consent . . . they have no more authority than they have apparently been given by the consent." *United States v. Fields*, 131 Fed. App'x 42, 44 (5th Cir. 2005).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  Courts must "take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope . . ." *Fields*, 131 Fed. App'x at 44.  For example, consent to search may be limited in terms of time, duration, area, or intensity.  *United States v. Green*, 388 Fed. Appx. 375, 382-83 (5th Cir. July 1, 2010) (unpubl.) (citation omitted).  Nonetheless, the failure to object to a search is "an indication that the search was within the scope of the initial consent."  *See e.g. United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995); *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991).

16

Here, there is no question that the scope of Pryor's consent extended to the contraband found in the house.  Fulmer directly asked Pryor, "you don't mind if we search your house?" Pryor replied, unequivocally, "no, go ahead." (Tr. 18).  *Id*.  There is no evidence that Pryor limited the scope of his consent, or otherwise retracted his consent once given.

Accordingly, the undersigned finds that the government lawfully seized the Heritage Manufacturing, model Rough Rider, .22 caliber revolver, .22 ammunition, and various quantities of marijuana pursuant to Defendant's free and voluntary consent.

### c) The Fourth and Fifth (via the Fourteenth) Amendments do not Bar the Admission of Pryor's Incriminating Statements at Trial

The admissibility of pre-indictment confessions is regulated by both the Fifth Amendment Privilege against Compelled Self-incrimination ("Fifth Amendment") and the Due Process Clause of the Fifth and/or Fourteenth Amendments ("Due Process Clause").  The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself . . ."  U.S. CONST. AMEND. V.  In *Miranda v. Arizona*, the Supreme Court held that

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966) (footnote omitted).

The central principle established by *Miranda* is that if the police question an in-custody suspect without informing him of the rights specified therein, then his responses cannot be introduced

into evidence to establish his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144 (1984). "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting waiver has generally produced a virtual ticket of admissibility . . ." *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 2608 (2004) (footnote omitted).

In addition, a criminal defendant is "deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession and even though there is ample evidence aside from the confession to support the conviction." *Lego v. Twomey*, 404 U.S. 477, 483-484, 92 S.Ct. 619, 623- 624 (1972) (citations and internal quotation marks omitted). The defendant is entitled to "object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Id*. The sole purpose of the hearing is to determine whether the confession was coerced. *Id*.

The government must establish by a preponderance of the evidence the voluntariness of an incriminating statement and the *Miranda* waiver. *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515 (1986); *Lego, supra; United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). The voluntariness of a waiver contemplates two distinct dimensions:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citation omitted).

Nevertheless, in *Connelly*, the Supreme Court clarified that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly, supra*. Equally, "[t]he sole

18

concern of the Fifth Amendment, on which Miranda was based, is governmental coercion." *Id*. Thus, the voluntariness of a Miranda waiver and resulting confession depend upon the absence of police overreaching, not on "free choice." *Id*.

The Fifth Circuit remarked that, after *Connelly*, the relevant test no longer focuses on the defendant's free will. *United States v. Raymer*, 876 F.2d 383, 386 -387 (5th Cir. 1989) (citations omitted). "Instead, the focus is on the presence or absence of police coercion." *Id*. Although a defendant's mental condition still figures into the voluntariness calculus, there must be an element of official overreaching to render a confession involuntary under the Constitution. *Id*. In other words, the police must exploit the defendant's mental condition. *See Raymer, supra*.

Applying the foregoing considerations here, the undersigned reiterates that there was no antecedent Fourth Amendment violation. *See* discussion, *supra*. Furthermore, Officer Fulmer advised Pryor of his *Miranda* rights shortly after entering the home, and before he obtained any potentially incriminating statements from Pryor. The record is devoid of any allegations or evidence of coercive police tactics. Moreover, there are no issues regarding Pryor's mental competence or lucidity at the time that he made the incriminating statements.

In the absence of police "overreaching" or coercion and upon consideration of the circumstances, the undersigned finds that the government has demonstrated by a preponderance of the evidence the voluntariness of Pryor's incriminating statement(s) and *Miranda* waiver.[15]

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 16] filed by Defendant

---

[15]  The government seeks a determination by the court that Defendant's incriminating statements are admissible at trial. The undersigned's proposed resolution of the instant motion has that effect.

Michael Pryor be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 17th day of September 2013.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE